UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CELINA INSURANCE GROUP ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 1:22-CV-39-HAB |
| ) | |
| CARL ZINSMEISTER, ) | |
| DOUGLAS STEPHAN, AND ) | |
| DICK AND AUDREY STEPHAN, LP ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Defendants, Douglas Stephan ("Stephan") and Dick and Audrey Stephan, LP ("the Partnership"), sued Plaintiff's insured, Defendant Carl Zinsmeister ("Zinsmeister"), in Huntington County Circuit Court ("the Underlying Suit") alleging that Zinsmeister defamed them in front of the Huntington County Plan Commission. Zinsmeister requested a defense and indemnification coverage through a farm insurance policy issued by Plaintiff, Celina Insurance Group ("Celina"). Celina twice denied the request for coverage and filed the present complaint for declaratory judgment seeking a determination that it does not owe Zinsmeister a defense or indemnity[1] for the claims against him in the Underlying Suit. Before the Court are fully briefed cross-motions for summary judgment (ECF Nos. 30, 35).[2] Because the Court finds that there is no coverage under

---

[1] During the pendency of this federal suit, the Underlying Suit concluded. The parties agree that the sole issue remaining is the duty to defend claim as it relates to attorney fees to be paid for Zinsmeister's defense. The indemnification claim is moot based on the state court's resolution of the Underlying Suit. Nonetheless because the Court finds the Policy does not cover the conduct in the Underlying Suit, Celina does not owe a duty to indemnify Zinsmeister.

[2] Celina moved to strike the cross-motion filed by Zinsmeister arguing that it was untimely. True, Zinsmeister missed the dispositive motion deadline; but, Celina has not alleged any prejudice from the belated filing. Further, Celina had an adequate opportunity to respond to the arguments raised by Zinsmeister in its cross-motion as they were the same arguments articulated by Zinsmeister in response to

the insuring agreement of the Policy, Celina's Motion for Summary Judgment will be GRANTED; Zinsmeister's cross-motion will be DENIED.

## DISCUSSION

1. **Factual Background**

The facts leading to the present insurance coverage case are largely undisputed by the parties and are supplemented by the state court's record. On May 9, 2018, the Huntington County Plan Commission met to discuss an application from the Partnership relating to a 69.01 acre parcel it owned located on the northeast corner of 700 North and 600 West, Huntington, Indiana ("the Real Estate"). The application sought primary plat approval for four lots to be subdivided from this parcel. (Findings of Fact, ECF No. 30-6, ¶¶ 3, 4). After learning of the meeting, Zinsmeister attended to voice his concerns and opinions as an interested party who owns property in proximity to the real estate. (*Id.* ¶21).[3] While in attendance, Zinsmeister did just that; he expressed concerns he had about the validity of the Partnership including when the Partnership was formed, who formed it, and who had authority to act on its behalf. (*Id.* ¶24). Zinsmeister had been unable to find this information from the GIS listing for the Real Estate and he did not want to see homes or trailers permitted on the subdivided property "that were not in line with the general quality of the area." (*Id.* ¶26). He also expressed his concern that any decision by the Plan Commission might be reversed or altered if the Partnership was invalid. Following Zinsmeister's comments, the Plan Commission tabled the request to subdivide the parcels. Subsequently, the Partnership formally

---

Celina's motion for summary judgment. The request to strike the cross-motion contained in ECF No. 37 is DENIED.

[3] Zinsmeister owns property less than one mile from the Real Estate and his home is less than two miles from the Real Estate. (Findings of Fact, ¶22).

withdrew its application to divide the Real Estate and the Plan Commission removed the application from consideration. (*Id.* ¶¶s 31-33.) But that was not the end of the matter.

On April 23, 2020, Stephan and the Partnership filed the Underlying Suit. (ECF No. 30-3). The Underlying Suit, which named both Stephan and the Partnership as plaintiffs, generally alleged that Zinsmeister "made slanderous statements against the Plaintiff" at the Plan Commission meeting. (*Id.* ¶ 3). The specific allegations include:

- Zinsmeister "appeared before the Huntington County Plan Commission on May 9, 2018, and made specific statements regarding real estate held in the name of the Dick and Audrey Stephan, LP, owned and/or operated by Douglas Stephan, which the Defendant knew, or should have known were false and misleading." (*Id.* ¶ 4).

- Zinsmeister's "statements include, but are not limited to, statements expressing 'concerns about the LP' and, 'I can't find out any information about the LP, how it was formed, when it was formed, who had the authority …';."

- Zinsmeister "also made rather vague references to the community receiving a 'black eye' related to the Plaintiff's request to sell parcels from certain farm real estate." (*Id.* ¶ 5)

- "the statements made by the Defendant strongly infer, and seemed intended to convey the impression, that the ownership of the real estate in question was uncertain or clouded and that the Plaintiff was acting in bad faith by seeking authority from the Huntington County Plan Commission to divide a portion of the LP real estate." (*Id.* ¶ 7)

- "in fact, the real estate in question had been deeded to the Dick & Audrey Stephan, LP, in 2012, with deeds available to the public in the Office of the Recorder of Huntington County, Indiana; and the Dick & Audrey Stephan, LP, had been properly formed and was on record with the Indiana Secretary of State, also since April of 2012." (*Id.* ¶ 8)

- Stephan "owned all, or a significant majority of the partnership shares, including the right to manage and control the LP's real estate, and to make all decisions on behalf of the LP." (*Id.* ¶ 9)

- "by reporting to the Huntington County Plan Commission that the Defendant couldn't find information about the Limited Partnership or

3

> information as to the ownership of the real estate, the Defendant purposefully created the impression with the Plan Commission that the request being made on behalf of the Plaintiff was improper, which directly led to the delay of any consideration of the Plaintiffs' [application] and prevented the Plaintiffs from timely selling certain real estate." (*Id.* ¶ 10)

- "the Defendant has acted in bad faith by making false and/or misleading statements in a public hearing that were specifically intended to prevent the Plaintiff from receiving permission to divide and sell portions of said real estate, causing a substantial financial loss to the Plaintiffs." (*Id.* ¶ 11)

- "the Plaintiffs have, and will continue to suffer financial losses as a direct and indirect result of the Defendant's actions." (*Id.* ¶ 12)

On April 30, 2020, Zinsmeister sought defense and indemnification coverage from Celina for the Underlying Suit based upon its Farm Security Policy No. 8009816-0 ("the Policy"). (Policy, ECF No. 30-2). On May 15, 2020, Celina denied Zinsmeister's request for defense and indemnification as to the Underlying Lawsuit asserting that the claims of slander and for financial loss alleged in the Underlying Suit are not covered under the insuring agreement for the Policy. (ECF No. 30-4). On December 6, 2021, Celina reiterated its denial of Zinsmeister's request for coverage in the Underlying Suit. (ECF No. 30-5).

On February 2, 2022, Celina filed its Complaint for Declaratory Judgment seeking a determination that it does not owe Zinsmeister a defense or indemnity for the claims against him in the Underlying Lawsuit. While Celina's declaratory judgment action was pending, the Underlying Suit resolved in Zinsmeister's favor. In the summary judgment order granting summary judgment in Zinsmeister's favor, the state court determined that Stephan and the Partnership failed to show malice nor did they show damages as they formally withdrew the application pending before the Plan Commission. (ECF No. 30-6). The state court ordered the parties to pay their own attorney fees. (ECF No. 30-6 at 16).

2. **Applicable Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes for the non-moving party. *See Anderson*, 477 U.S. at 255.

The fact that the parties have cross-moved for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

3. Analysis

In its motion for summary judgment, Celina argues that the plain language of the Policy precludes coverage for the defamation claim alleged against Zinsmeister in the Underlying Suit. Celina argues two main points as to why there is no coverage: (1) the Underlying Suit did not stem from an "occurrence" as that term is defined under the Policy; and (2) the claims in the Underlying Suit did not allege "property damage." Without coverage under its Policy, Celina asserts there is no corresponding duty to defend.

For his part, Zinsmeister disputes these arguments. He urges the Court to find that the Policy's definition of "occurrence" is ambiguous and that the Underlying Suit's claim of damages for "loss of use" constitutes "property damage" under the Policy. In his view, any alleged ambiguity should be read to favor coverage and so includes a duty to defend.

   *a. Principles of Insurance Interpretation*

Because the interpretation of a contract is a matter of law, cases involving the interpretation of insurance contracts are particularly suitable for summary judgment. *Wright v. Am. States Ins.*, 765 N.E.2d 690, 692 (Ind. Ct. App. 2002). Provisions of insurance contracts are subject to the same rules of construction as other contracts; the Court interprets an insurance policy to ascertain and enforce the parties' intent as revealed by the insurance contract. *Id.* To that end the Court must construe the insurance policy as a whole, rather than considering individual words, phrases, or paragraphs. *Id.* at 692-93. If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning. *Id.* An unambiguous exclusionary clause is ordinarily entitled to enforcement. *Id.* at 694.

The Court accepts an interpretation of the contract language that harmonizes the provisions rather than one that supports a conflicting version of the provisions. *Wright*, 765 N.E.2d. at 693.

"Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence." *Id.* "If reasonably intelligent persons honestly may differ as to the meaning of the policy language, the policy is ambiguous." *Id.* "One way of determining whether reasonable persons might differ is to see if the policy language is susceptible to more than one interpretation." *Meridian Mut. Ins. v. Auto-Owners Ins.*, 698 N.E.2d 770, 773 (Ind. 1998).

In a duty-to-defend action under Indiana law, the deck is stacked for the insured as "the duty to defend is broader than coverage liability." *Trisler v. Indiana Ins.*, 575 N.E.2d 1021, 1023 (Ind. Ct. App. 1991). "It is the nature of the claim, not its merit, which establishes the insurer's duty to defend." *Id.* "Consequently, if it is determined that an insurer has a contractual duty to defend a suit based upon risks it has insured, the insurer will not be relieved of that obligation, regardless of the merits of the claim." *Id.*

"The insurer's duty to defend is determined from the allegations of the complaint coupled with those facts known to or ascertainable by the insurer after reasonable investigation." *Trisler*, 575 N.E.2d at 1023. "Accordingly, in evaluating the factual basis of a claim and the insurer's concomitant duty to defend, this court may properly consider the evidentiary materials offered by the parties to show coverage or exclusion." *Id.* "If the pleadings fail to disclose a claim within the coverage limits or one clearly excluded under the policy, and investigation also reveals the claim is outside the coverage of the policy, no defense will be required." *Id.*

   b. *Application*

Turning first to the allegations in the Underlying Suit, there is no question that the allegations sound in defamation. In Indiana, "to establish a claim of defamation, a plaintiff must prove the existence of a communication with defamatory imputation, *malice*, publication, and damages." *Wartell v. Lee*, 47 N.E.3d 381, 385 (Ind. Ct. App. 2015) (emphasis added). Actual

7

malice, as an element of the tort of defamation, exists when the defendant publishes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 456 (Ind. 1999). The Underlying Suit alleged that Zinsmeister made statements which he knew, or should have known, were false and misleading; that he made the utterances at a public hearing intending to prevent the Underlying Plaintiffs from receiving permission to divide and sell portions of the Real Estate; and that these acts caused the Underlying Plaintiffs substantial financial loss.

Coverage under the Policy is triggered by an "occurrence." The relevant portion of the insuring agreement provides for dual obligations on Celina's part:

> If a claim is made or a "suit" is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
>
> 1. Pay up to our limit of liability for damages for which an 'insured' is legally liable....; and
>
> 2. Provide a defense at our expense by counsel of our choice, even if the "suit" is groundless, false or fraudulent. We may investigate and settle any claim or "suit" that we decide is appropriate.

(ECF No. 30-2, at 29). An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (ECF No. 30-2, at 10); see also *Tri-Etch, Inc. v. Cincinnati Ins Co.,* 909 N.E.2d 997, 1002 (Ind. 2009) (noting that this definition is a "widely used CGL" definition). The Policy does not further define "accident" but, in the context of insurance coverage, it is widely accepted in Indiana that "an accident means an unexpected happening without an intention or design." *Auto–Owners Ins. Co. v. Harvey,* 842 N.E.2d 1279, 1283 (Ind. 2006).

8

According to Celina, the insuring agreement does not cover the defamation claim in the Underlying Suit because no "occurrence" i.e., no accident, occurred. It points to the above allegations of intentional conduct in the Underlying Suit and argues that there is no accident or negligent conduct alleged, only intentional acts by Zinsmeister. Applying Indiana's accepted definition of "accident" to the allegations in the Underlying Suit, Celina asserts both that Zinsmeister intended to make the defamatory statements *and* he intended the statements to cause the harm to the Partnership and Stephan. Taking it one step further, Celina argues that the injuries asserted in the Underlying Suit were expected and intended and therefore, not caused by "accident" and, in turn, not an "occurrence."

Zinsmeister sees the argument differently. He argues that the definition of "occurrence" is ambiguous and cites *Harvey* to support his assertion that where there is an ambiguous term the insuring clause favors coverage. *Harvey,* 842 N.E.2d at 1284. In *Harvey*, a 16-year-old girl fell into the Wabash River and drowned after being intentionally pushed during an altercation with the insured. The girl's parents filed a wrongful death action against the insured alleging that his "negligence and recklessness" had caused their daughter's death. They also filed a declaratory judgment action against the homeowner's insurer, Auto-Owners, seeking coverage under a homeowner's liability policy. Auto-Owners denied it had any duty to defend or indemnify its insured arguing, as Celina does here, that the insured's conduct was not an "occurrence." Based on the facts of the case, the Indiana Supreme Court determined that "the meaning and application of this [occurrence] provision is unclear." *Id.* The court found the definition of "occurrence" was ambiguous because if judged by the insured's conduct – the push – there clearly was no accident; but if judged by the result – the girl's fall and drowning – then there was an accident because the insured did not intend the resulting harm. *Harvey,* 842 N.E.2d at 1285.

Zinsmeister argues his actions should be examined similarly to those of the insured in *Harvey* and that the Court should conclude, as *Harvey* did, that the term "occurrence" is ambiguous. To that end, he asserts that although the Complaint alleges that he intended to make false utterances, the Complaint alleges only an intent to delay or prevent the subdivision of the Real Estate, not the financial loss to the Plaintiffs:

> The alleged statements of Mr. Zinsmeister might be considered "intentional" in that he intended to make an utterance. The Complaint also alleges that Defendant "specifically intended to prevent [Plaintiff] from receiving permission to divide and sell a portions [sic] of said real estate." … Notwithstanding these averments, the Complaint does not allege Zinsmeister intended or designed that his utterances, or any delay in consideration of Plaintiff's proposal proximately caused thereby, actually prevent[ed] the Underlying Plaintiffs from timely selling any real estate and for the calculated purposes of causing the Underlying Plaintiff's substantial financial loss.

(ECF No. 35 at 4-5). The Court disagrees that the holding in *Harvey* can be painted with such a fine brush.

First, there is nothing in *Harvey* that suggests that it's the extent of the injury that must be intended. *Harvey* would have resolved the same way regardless of the injury suffered by the girl. The issue in *Harvey* was not what harm resulted; indeed, the court was not concerned with whether the insured intended to kill the girl but whether he intended bodily injury when he pushed her. *See Harvey*, 842 N.E.2d at 1287 ("There is a significant difference between whether *injury* results from an occurrence or accident, and whether it is *intentionally inflicted* by the insured.")(emphasis added).

Zinsmeister's attempt to slip the holding of *Harvey* neatly into the facts here is misplaced. At most, *Harvey* supports the notion that accidental results can flow from intentional acts. Indeed, *Harvey* recognizes situations in which an injury may be unintended even though the original acts leading to the injury were intentional. *See Harvey*, 842 N.E.2d at 1285 ("We decline to hold that

10

Brandy's drowning death, even though resulting from [the insured's] conscious and intentional act of pushing her, necessarily falls outside the concept of 'accident' upon which 'occurrence is defined…"). This conclusion is further supported by *Harvey's* express rejection of the insurer's argument that the insured's guilty plea to involuntary manslaughter conclusively established the requisite intent to cause bodily injury, writing:

> At most, the guilty plea shows only that [the insured] intended the battery and that her death resulted. But it does not establish that he intended Brandy's slip, fall, and drowning and thus does not preclude the assertion that her death was accidental, and thus an 'occurrence.' The 'occurrence' language … must be construed to refer not to [the insured's] push, but to Brandy's slip, fall, and drowning. The push was not accidental, but a genuine issue exists whether the drowning and resulting death were.

*Id.* at 1287.

The Underlying Plaintiffs specifically alleged in their Complaint that Zinsmeister intended to injure the Plaintiffs by making false statements to the Plan Commission. These allegations are sufficient to plead Zinsmeister out of coverage and, in turn, a defense under the Policy. *Sentinel Ins., Ltd. v. Durham Eng'g, Inc.,* 431 F. Supp. 3d 1023, 1031 (S.D. Ind. 2020) ("to determine if the duty to defend is triggered, the key inquiry is whether any of the allegations contained in the complaint allege accidental conduct."). While *Harvey* distinguishes between intentional conduct that yields unintentional results from that conduct, it does not go so far as to say that an *intended injury* based on *intentional conduct* can be accidental. Rather, *Harvey* confirms that it is the intentional act together with the intent to produce the consequences that determines whether an "accident" has caused the resulting injury. The Underlying Suit asserts that Zinsmeister intended his utterances to cause injury to the Underlying Plaintiffs.[4] The allegations that Zinsmeister

---

[4] Although not binding authority for this Court to rely on, the Court finds it persuasive that Associate Justice Souter shared this Court's view when he addressed the issue as a sitting Justice on the New Hampshire Supreme Court:

intended to cause injury foreclose his claim for coverage based on the insuring language in the Policy. Because the Court finds no coverage, there is no duty on Celina's part to defend or indemnify Zinsmeister for the claims against him in the Underlying Suit. Celina's Motion for Summary Judgment is GRANTED. Zinsmeister's cross-motion for Summary Judgment is DENIED.[5]

## CONCLUSION

Based on the above, Celina's Motion for Summary Judgment is GRANTED (ECF No. 30); Zinsmeister's Cross-Motion for Summary Judgment is DENIED. (ECF No. 35). Celina's Motion to Strike Zinsmeister's Cross-Motion for Summary Judgment contained in ECF No. 37 is DENIED. Consistent with this Order, the Court DECLARES as follows:

(1)  The Policy issued by Celina to Zinsmeister does not cover the claims asserted in the Underlying Lawsuit;

(2) Celina is not legally obligated under the Policy to defend Carl Zinsmeister in the Underlying Lawsuit; and

(3) Celina is not legally obligated under the Policy to indemnify Zinsmeister for any judgment against him in the Underlying Suit.

The CLERK is DIRECTED to enter final judgment for Celina and against Zinsmeister.

---

an insured's act is not an accidental contributing cause of injury when the insured actually intended to cause the injury that results. "[A]n accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen [circumstance exists or] happening occurs which produces or brings about the result of injury or death."

*Vermont Mut. Ins. v. Malcolm,* 128 N.H. 521, 523–24, 517 A.2d 800, 802 (1986).

[5] Because the Court finds that the Underlying Suit is not an "occurrence" under the insuring language of the Policy, the Court need not address the other arguments of the parties.

SO ORDERED on March 28, 2024

                                            s/ *Holly A. Brady*
                                            CHIEF JUDGE HOLLY A. BRADY
                                            UNITED STATES DISTRICT COURT